# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

JACK JENKINS,

       Plaintiff,

vs.                                                                  No. CIV 07-0319 JB/KBM

BOARD OF THE LAS CRUCES PUBLIC
SCHOOL DISTRICT, Individually and in
their capacity as School Board members,
and SONIA DIAZ, Individually and in her
capacity as Superintendent,

       Defendants.

## MEMORANDUM OPINION AND ORDER

    **THIS MATTER** comes before the Court on the Defendant's Motion for Partial

Summary Judgment, filed April 18, 2008 (Doc. 39)("Motion").  The Court held a hearing on

September 3, 2008.  The primary issues are: (i) whether the record supports a finding of

deprivation of a protected property interest without due process of law through constructive

discharge; and (ii) whether the conduct of Defendants Board of the Las Cruces School District

("Board") and Sonia Diaz was sufficiently shocking to the judicial conscience to constitute a

substantive due-process violation.[1]  Because the Court concludes that the record does not support

a finding that Plaintiff Jack Jenkins was constructively discharged, but that he voluntarily

resigned, there is no violation of due process.  Additionally, the Court concludes that the record

---

[1] Diaz is no longer a Defendant in this case.  She filed a motion to dismiss, see Defendant
Sonia Diaz' Motion to Dismiss and for Qualified Immunity and Supporting Memorandum, filed
April 9, 2007 (Doc. 8), and Plaintiff Jack Jenkins chose to drop her from the case rather than contest
the motion, see Notice of Dismissal, filed July 23, 2007 (Doc. 15).

does not support a finding that the conduct of Diaz and the Board rose to the level of outrageousness necessary to support a substantive due-process violation. Because there is no genuine issue of material fact, the Court grants summary judgment as to Count I of Jenkins' Amended Complaint.  The Court will exercise supplemental jurisdiction over the remaining state claims in this case because the issues are interrelated and do not involve complex or novel issues of state law.

**FACTUAL BACKGROUND**

Jenkins was hired as the Chief Financial Officer of the Las Cruces School District ("District") on October 25, 1991. See Exhibit A to Notice of Removal, Plaintiff's First Amended Complaint ¶ 12, at 3, filed April 2, 2007 (Doc. 1-2)("Amended Complaint").   His employment with the district has always been subject to a written contract. See id. ¶ 13, at 3. During the time that the incidents herein occurred, Jenkins was operating under a three-year contract beginning July 1, 2005. See id. ¶ 15, at 3.   The District was bound, by the terms of this contract, to terminate Jenkins' employment for cause only.   Id. ¶ 16.   Appointing and hiring the Superintendent is the only personnel matter left to the District's Board.   See Exhibit D to Defendant's Reply Memorandum in Support of Its Motion for Summary Judgment (Doc. 59)("Reply"), Deposition of Leonel Briseno at 8:1-24 (taken May 1, 2008)(Doc. 59-4)("Briseno Depo."). The Superintendent was responsible for all other personnel decisions.   See id.

The Board hired Joann Patton as interim superintendent between October 8, 2005, and June 30, 2006.   See Exhibit to Memorandum in Opposition to Defendant Board of Las Cruces Public School District's Partial Motion for Summary Judgment, filed May 12, 2008 (Doc. 46)("Response"), Affidavit of Joann Patton ¶ 4, at 1 (executed May 9, 2008)(Doc. 46-6)("Patton Aff.").

Jenkins had no difficulties working with Patton. <u>See</u> Exhibit A to Defendant's Memorandum in Support of its Motion for Partial Summary Judgment, filed April 18, 2008 (Doc. 40)("Memo. in Support"), Deposition of Jack Jenkins at 37:5-12 (taken March 19, 2008)(Doc. 40-4)("Jenkins Depo."). Jenkins maintains, however, that things started "downhill" for him on July 27, 2006, when he received a letter of warning concerning two previously investigated accusations of sexual harassment. Jenkins Depo. at 147:5-8. Patton delivered the letter to Jenkins warning him that any future accusations of sexual harassment could result in disciplinary action being taken. <u>See</u> <u>id.</u> at 39:16.

Patton initially refused to write this letter of reprimand because she did not believe it was warranted. <u>See</u> Patton Aff. ¶ 7, at 2. Nevertheless, Patton delivered to Jenkins the letter written by the Board's attorney, Andrew Sanchez, and conveyed to Jenkins that some Board members would like him terminated. <u>See</u> <u>id.</u> ¶¶ 10-11, at 2. Jenkins alleges that the Board had a "hit list" of employees targeted for termination. <u>See</u> Jenkins Depo. at 38:13-16; Affidavit of Sally Velez ¶ 9, at 2 (executed May 12, 2008)(Doc. 46-6)("Velez Aff."). On July 1, 2006, Defendant Sonia Diaz became the new Superintendent for the District. <u>See</u> <u>id.</u> at 29:20-21. Jenkins alleges that the Board hired Diaz as Superintendent on the condition that she would terminate designated employees, including him. <u>See</u> Amended Complaint ¶ 21, at 4.

Jenkins admits that he had a total of three encounters with Diaz. <u>See</u> Jenkins Depo. at 42:23. Diaz accused Jenkins of being rude to Board Member Leonel Briseno at a Bond Issue Executive Committee meeting. <u>See</u> <u>id.</u> at 43:23-24. On July 1, 2006, Diaz sent a letter to Jenkins instructing him to write a letter of apology to Briseno. <u>See</u> Exhibit F to Memo. in Support, Letter from Sonia Diaz to Jack Jenkins (dated July 1, 2006)(Doc. 40-9)("First Diaz Letter"). Jenkins did not believe that he had been rude to Briseno. <u>See</u> Jenkins Depo. at 48:1.

-3-

Briseno does not recall Jenkins being rude to him.  <u>See</u> Briseno Depo. at 56:4-22.  Jenkins stated, however, that, if he had been rude, it would have been appropriate for the Superintendent to request that he apologize.  <u>See</u> Jenkins Depo. at 48:13-14.

Jenkins' second interaction with Diaz took place at an administrative meeting before July 1, 2006.  <u>See</u> <u>id.</u> at 50:12-15.  Diaz asked everyone to share a book that had impacted his or her life.  <u>See</u> <u>id.</u> at 50:16-19. When Jenkins said "Wild Animals I Have Known," Diaz allegedly responded: "Is that your biography?"  <u>Id.</u> at 50:20-25.  Jenkins reports that he was shocked by this comment. <u>See</u> Response ¶ 9, at 6.  Jenkins also alleges that one day Diaz accused him of parking in her parking spot, and that she was angry and upset. <u>See</u> Jenkins Depo. at 52:5-13.

Jenkins maintains that, because of the combination of his awareness that the Board wanted him terminated and of Diaz' acts of hostility, he became depressed and physically ill. <u>See</u> Amended Complaint ¶ 24, at 5.  Jenkins alleges that these interactions with Diaz constituted a deliberate campaign of "malicious, intentional, and continuous harassment" against him.  <u>Id.</u> ¶ 23, at 4.  According to Jenkins, this campaign of hostility caused him to become depressed and ill, and that he required extended medical leave to relieve his stress. <u>See</u> <u>id.</u> ¶¶ 24, 27, at 5.  On July 21, 2006, Jenkins requested two months of medical leave under the Family Medical Leave Act ("FMLA").  <u>See</u> Exhibit J to Memo. in Support, Extended Medical Leave Application (dated July 21, 2006)(Doc. 40-13)("Leave Application"). He was granted leave from July 26, 2006 to September 26, 2006. <u>See</u> Jenkins Depo. at 93:6-12.

Dr. Fay LaFon reported that Jenkins first presented with situational anxiety on July 19, 2006, as a result of adverse interactions at the workplace.  <u>See</u> Exhibit K to Response, Letter from Dr. LaFon ¶ 4, at 1 (dated September 13, 2006)(Doc. 46-2)("LaFon Letter").  According to Dr. LaFon, Jenkins suffered from an increase of shortness of breath, heart palpitations,

headaches, extreme fatigue, loss of appetite, inability to sleep, depression, and anxiety.  See id. ¶ 3, at 1.  Dr. LaFon placed Jenkins on medical leave to safeguard his health from further deterioration.  See id. ¶ 4, at 1.  Dr. LaFon reported that Jenkins' health continued to worsen and that the on-going legal correspondence contributed to his stress.  See id.

Clinical psychologist Dr. Joe Alexander reported that, when he saw Jenkins on August 3, 2006, Jenkins presented with depression, paroxysms of weeping, sudden weight loss, psychological paralysis, an unexplained sense of doom, loss of interest in life, and an uncontrollable obsession to replay in his mind the events associated with his perceived catastrophe. See Exhibit L to Response, Letter from Dr. Alexander ¶ 4 (dated August 30, 2006)(Doc. 46-2)("Alexander Letter").  Dr. Alexander recommended that Jenkins avoid situations and places associated with his trauma until he was able to handle the stress.  See id. ¶ 6.  While on medical leave, Dr. Alexander encouraged Jenkins to attend a family reunion at the Inn of the Mountain Gods in Ruidoso, New Mexico.  See id.

During the time that Jenkins was on medical leave, he continued to receive correspondence from Diaz and Mr. Sanchez, the District's attorney.  See, e.g., Exhibit N to Response, Letter from Mr. Sanchez to Mr. Pickett (dated September 7, 2006)(Doc. 46-3)("Third Legal Letter"); Exhibit O to Response, Letter from Mr. Sanchez to Mr. Pickett (dated September 21, 2006)(Doc. 46-3)("Fourth Legal Letter").   Diaz and the Board requested additional information regarding the medical condition justifying his extended leave.  See Jenkins Depo. at 64:12-18.  Diaz also requested that Jenkins meet with her on August 21, 2006, to review his doctor's report.  See Exhibit K to Memo. in Support, Letter  from Sonia Diaz to Jack Jenkins at 2 (dated July 28, 2006)(Doc. 40-14)("Second Diaz Letter").  Jenkins says that Diaz cancelled this meeting, which further distressed him, because preparing for the meeting caused him additional

unnecessary stress. See Response ¶ 14, at 8. Jenkins alleges that District employees are not generally required to justify medical leave under the FMLA. See Response ¶ 16, at 9; Affidavit of Charles White ¶ 7, at 2 (executed on May 9, 2008)(Doc. 46-6)("White Aff."). Jenkins concedes, however, that under the FMLA, employers have the right to inquire about the underlying medical conditions justifying leave. See Jenkins Depo. at 71:1-4.

While on medical leave, Jenkins was observed at a casino at the Inn of the Mountain Gods. See id. at 78:16-19. This observation is what prompted the Board to request further documentation of his mental and physical condition. See Exhibit M to Memo. in Support, Letter from Mr. Sanchez to Mr. Picket (dated August 21, 2006)(Doc. 40-16)("First Legal Letter"). Mr. Sanchez, the district's attorney, granted Jenkins an extension of time to produce the documentation of his medical status. See Exhibit E to Memo. in Support, Letter from Mr. Sanchez to Mr. Pickett (dated August 25, 2006)(Doc. 40-8)("Second Legal Letter"). Correspondence from Mr. Sanchez also included notification that Ignosencia Campos had re-filed the February, 2006 complaint of sexual harassment and that Diaz had reopened the investigation against him. See First Legal Letter at 4. Campos re-filed her complaint of sexual harassment because she was dissatisfied with the District's resolution of the matter. See Exhibit B to Reply, Affidavit of Ignosencia Campos ¶¶ 5, 6, at 1 (executed June 12, 2008)(Doc. 59-4)("Campos Aff.").

Jenkins alleges that the Board encouraged Diaz' rude behavior in a deliberate attempt to make his work environment intolerable and that the correspondence from Mr. Sanchez during his medical leave was intended to further harass him. See Jenkins Depo. at 51:15-18; Response ¶ 14, at 8.

According to Jenkins, the stress caused by these additional interactions exacerbated his depression and physical illness, and he ultimately had no choice but to quit his job. See Amended Complaint ¶¶ 32-34, at 6.  Jenkins decided to resign on September 13, 2006. See Jenkins Depo. at 88:18-19.  Jenkins submitted his letter of resignation to the Board on September 26, 2006.  See Exhibit N to Memo. in Support, Letter of Resignation from Jack Jenkins (dated September 26, 2006)(Doc. 40-17)("Resignation Letter").

Around October 2006, the Board investigated Diaz because of allegations by several District employees that she had been rude and unprofessional. See Exhibit I to Memo. in Support, Deposition of Jack Schwebke at 83:1-5 (taken March 20, 2008)(Doc. 40-12)("Schwebke Depo.").  The Board terminated her employment partly on the ground that she mistreated district employees and the Board disapproved of her conduct.  See id. at 84:5-11.

## PROCEDURAL BACKGROUND

The Board moves the Court for summary judgment on Count I in Jenkins' Amended Complaint, which states a federal claim under 42 U.S.C. § 1983 for violating his civil rights. See Motion at 1. Jenkins alleges that the Board and Diaz' actions deprived him of a constitutionally protected property interest in his job.  See Amended Complaint ¶¶ 45-48, at 8. Jenkins argues that the Defendants' actions were in violation of both procedural and substantive due process, and of the Equal Protection Clause under a "class-of-one" theory.  Id. ¶¶ 46-47, at 8.

The Board contends that Jenkins' civil-rights claims cannot survive summary judgment. First, the Board argues that, to support a procedural due-process claim, Jenkins must show that he was constructively discharged. The Board asserts that, while his workplace may have become unpleasant for Jenkins, it was not sufficiently intolerable that a reasonable employee would feel

that he or she had no other option but to quit. The Board argues that Jenkins' resignation was voluntary and that, consequently there was no procedural due-process violation.  See Memo. in Support at 10, 14.  Second, the Board argues that there is nothing in the record that is sufficiently shocking to the judicial conscience to support a substantive due-process violation.  See id. at 10-11.  Finally, the Board argues that Jenkins cannot show that he has suffered an adverse-employment action or that he was treated differently than others, and thus cannot show a violation of equal protection.  See id. at 12-13.

In response, Jenkins argues that the Board targeted him for termination and that the Board's actions amounted to a constructive discharge, which would be a violation of equal protection and due process, because Jenkins' employment contract allowed for termination only for just cause.  See Response at 13-15.  Additionally, Jenkins reasserts his claim that Diaz' conduct and subsequent legal correspondence during his medical leave constituted outrageous conduct amounting to a violation of his substantive due-process rights.

The Board filed a reply asserting that Jenkins failed to provide any evidence contesting the stated facts.  See Reply at 2. The Board argues that Jenkins contested the stated facts solely with statements as to how he interpreted each interaction with Diaz and the Board.  See id.  The Board argues that such statements alone cannot defeat a motion for summary judgment.  See id. at 7.

After the parties had completed their briefing on the motion, the Supreme Court of the United States decided Engquist v. Oregon Dep't of Agriculture, 128 S.Ct. 2146 (2008).  The Supreme Court held that the class-of-one theory of equal protection does not apply to public employment.  See id. at 2148-49.  At the hearing, Jenkins conceded that his equal-protection

claim was no longer viable in the wake of <u>Engquist v. Oregon Dep't of Agriculture</u>.  <u>See</u>

Transcript of Hearing at 38:5-14 (taken September 3, 2008)(Pickett)("Tr.").[2]

At the hearing, the Court clarified that Jenkins' procedural due-process claim was based

on his argument that he possessed a property right in his contract with the District and that he

had been deprived of due process because he was constructively discharged.  <u>See</u> <u>id.</u> at 38:18-25.

The Court reminded the parties that conduct that violates substantive due-process usually must

be outrageous and go beyond a garden variety employment dispute.  <u>See</u> <u>id.</u> at 58:3-13.[3]

## LAW REGARDING SUMMARY JUDGMENT

Summary judgment shall be granted "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law."  Fed. R. Civ. P. 56.  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  The

opposing party may not rest upon mere allegations and denials in the pleadings, but must set

forth specific facts showing that there is a genuine issue for trial.  <u>See</u> <u>Anderson v. Liberty</u>

<u>Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)(citing Fed. R. Civ. P. 56(e)).  An issue of fact is genuine

if the evidence is significantly probative or more than merely colorable such that a jury could

reasonably return a verdict for the non-moving party.  <u>See</u> <u>id.</u> at 249-50 (citations omitted).

---

[2] The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

[3] The Defendants have also filed three other motions dealing with separate counts of the Complaint: (i) Amended Partial Motion to Dismiss, filed April 4, 2008 (Doc. 38); (ii) Defendant's Motion for Partial Summary Judgment Related to Damages, filed June 9, 2008 (Doc. 54); and (iii) Defendant's Motion for Summary Judgment on Count V, filed July 7, 2008 (Doc. 67).  The Court is exercising supplemental jurisdiction over the counts at issue in those motions and will decide them in separate orders.

Mere assertions or conjecture as to factual disputes are not enough to survive summary judgment.  See Branson v. Price River Coal Co., 853 F.2d 768, 771-72 (10th Cir. 1988).

The party seeking summary judgment has an "initial burden to show that there is an absence of evidence to support the nonmoving party's case." Munoz v. St. Mary-Corwin Hosp., 221 F.3d 1160, 1164 (10th Cir. 2000)(quoting Thomas v. IBM, 48 F.3d 478, 484 (10th Cir. 1995))(internal quotations omitted). Upon meeting that burden, the non-moving party must "identify specific facts that show the existence of a genuine issue of material fact." Munoz v. St. Mary-Corwin Hosp., 221 F.3d at 1164 (citations and internal quotations omitted). "The party opposing the motion must present sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor." Id. (citations and internal quotations omitted).

When evaluating a motion for summary judgment, the court examines the factual record and reasonable inferences in the light most favorable to the party opposing summary judgment. See Sigmon v. Community Care HMO, Inc., 234 F.3d 1121, 1124-25 (10th Cir. 2000). The mere existence of a scintilla of evidence in support of the plaintiff's position is not sufficient, however; there must be evidence on which the fact finder could reasonably find for the plaintiff. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 248. The non-moving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Celotex Corp. v. Catrett, 477 U.S. at 324 (internal quotations omitted). "The non-moving party must do more than simply show that there is some metaphysical doubt as to the material facts." Biester v. Midwest Health Servs., Inc., 77 F.3d 1264, 1266 (10th Cir. 1996)(internal quotation omitted).

## LAW REGARDING PROCEDURAL DUE PROCESS

States may not "deprive any person of life, liberty or property, without due process of law." U.S. CONST. amend. XIV, § 1. The due-process guarantee affords both procedural and substantive protections. See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985). To show a procedural due-process violation, a plaintiff must establish that the defendant deprived him of a life, liberty, or property interest. See United States. v. Salerno, 481 U.S. 739, 746 (1987).

"When assessing a procedural due process claim, this court looks to the three-factor balancing test articulated by the Supreme Court in Mathews v. Eldridge, 424 U.S. 319, 334-35 (1976)." Ward v. Anderson, 494 F.3d 929, 935 (10th Cir. 2007). The three factors are:

> [ (i) ] . . . the private interest that will be affected by the official action; [ (ii) ] . . . the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and [ (iii) ] . . . the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Id. (internal quotations omitted). Ultimately, "due process is flexible and calls for such procedural protections as the particular situation demands." United States v. Jones, 160 F.3d 641, 645-46 (10th Cir. 1998)(quoting Morrissey v. Brewer, 408 U.S. 471, 481 (1972)).

### 1.   Public Employment Can be a Protected Property Interest.

In the employment context, whether a plaintiff has a protected property interest in continued employment is a question of state law. See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 538; Bailey v. Kirk, 777 F.2d 567, 573 (10th Cir. 1985). Under New Mexico law, non-probationary public employees, who may be discharged only for good cause and by way of due-process grievance procedures, have a constitutionally protected property interest in the right to continued employment. See Copelin-Brown v. N.M. State Pers. Office, 399 F.3d 1248, 1245

-11-

(10th Cir. 2005).   Public employees may have a protected property interest in continued

employment on two grounds: (i) as a matter of law or (ii) as conferred by contract. "When a

person's employment can be terminated only for specified reasons, his or her expectation of

continued employment is sufficient to invoke the protections of the Fourteenth Amendment." Id.

at 1254 (citing West v. Grand County, 967 F.2d 362, 366 (10th Cir. 1992)).

### 2.       Constructive Discharge Can be a Due Process Violation.

The United States Court of Appeals for the Tenth Circuit has repeatedly held that "an

employee's constructive discharge from a position in which the employee has a protectable

property interest may be actionable under 42 U.S.C. § 1983."     Yearous v. Niobrara County

Mem'l Hosp., 128 F.3d 1351, 1355 (10th Cir. 1997)(citing Bailey v. Kirk, 777 F.2d at 579).

"A constructive discharge occurs when an employer, through unlawful acts, makes

working conditions so intolerable that a reasonable person in the employee's position would feel

forced to resign." Exum v. U.S. Olympic Comm., 389 F.3d 1130, 1135 (10th Cir. 2004).  The

question is not whether working conditions become difficult or intolerable, but whether, under

the circumstances, a reasonable person would have "no other choice but to quit." Lighton v.

Univ. of Utah, 209 F.3d 1213, 1222 (10th Cir. 2000)(quoting Yearous v. Niobrara County

Mem'l Hosp., 128 F.3d at 1357).  On the other hand, "a plaintiff who voluntarily resigns cannot

claim that he or she was constructively discharged." Exum v. U.S. Olympic Comm., 389 F.3d at

1135.

The Tenth Circuit has instructed that, "[t]o determine whether a jury question exists as to

the voluntariness of [a plaintiff's] resignation[ ], we consider the totality of the circumstances

under an objective standard." Yearous v. Niobrara County Mem'l Hosp., 128 F.3d at 1356.  The

factors that inform the court's analysis include whether the employee "(1) received some

-12-

alternative to resignation; (2) understood the nature of his choice; (3) had a reasonable time in which to choose; and (4) was permitted to select the effective date of resignation." Lighton v. Univ. of Utah, 209 F.3d at 1222.

In Yearous v. Niobarra County Mem'l Hosp., four nurses alleged that they had been constructively discharged when they were forced to work with a supervisor who they believed was dangerously unqualified. See Yearous v. Niobarra County Mem'l Hosp., 128 F.3d at 1351. The Tenth Circuit held that the question was "whether Plaintffs [ ] had the opportunity to make a free choice regarding their employment with Niobarra County Memorial Hospital." Id. at 1357. In determining whether the nurses voluntarily resigned, the Court examined the aforementioned four factors.

> [T]he board gave Plaintiffs an alternative to resignation, namely continuing to work and attempting in good faith to resolve their problems with [their supervisor] through internal procedures. Second, the facts illustrate that Plaintiffs understood quite well the choice the board gave them. Third, the board gave Plaintiffs an indefinite time period in which to choose by asking them to rescind their resignations and remain with the hospital. Finally, because the board did not want Plaintiffs to resign, Plaintiffs had complete control over the effective date of their resignations.

Id. The Tenth Circuit found the brief time frame during which the problems occurred was further evidence that no constructive discharge had occurred. "An employee who quits without giving his employer a reasonable chance to work out a problem has not been constructively discharged." Id. (citing Tidwell v. Meyer's Bakeries, Inc., 93 F.3d 490, 494 (8th Cir. 1996)). Thus, the Tenth Circuit held that "Plaintiffs' resignations were voluntary, albeit as a result of unpleasant and difficult circumstances." Id.

The Tenth Circuit applied the same four factors to determine the voluntariness of the resignation of a university professor in Lighton v. Univ. of Utah. In Lighton v. Univ. of Utah, a

professor at the University of Utah alleged that he had been forced to quit when he was given the choice to either sign a settlement agreement concerning an allegation of sexual harassment against him or possibly face disciplinary proceedings. See 209 F.3d at 1222.  The Tenth Circuit stated that "offering an employee a choice between resignation and termination does not violate an employee's due process of law, as long as the choice is voluntary."  Id. (quoting Lenz v. Dewey, 64 F.3d 547, 552 (10th Cir. 1995)).  The Tenth Circuit held that Dr. Lighton had the option of resigning or facing possible disciplinary action, that there was nothing to suggest that he did not understand his options, that he took three weeks from being told to sign the settlement agreement and tendering his resignation, and that he thus clearly selected the date of his resignation. See Lighton v. Univ. of Utah, 209 F.3d at 1223.

In evaluating a claim of constructive discharge, "[a] plaintiff's subjective views are irrelevant." Yearous v. Niobrara County Mem'l Hosp., 128 F.3d at 1357.  In Exum v. U.S. Olympic Comm., the plaintiff alleged that the U.S. Olympic Commission ("USOC") ignored doping by Olympic athletes and that his anti-doping efforts put him in conflict with the USOC. 389 F.3d 1130 at 1133. The plaintiff alleged that he was "criticized for not being a team player" and subjected to racial harassment and hostility. Id. The Tenth Circuit found that it was "not enough that a plaintiff suffered the ordinary slings and arrows that workers routinely encounter in a hard, cold world." Id. at 1135. The plaintiff "could have chosen to comply with his superior's order or, alternatively, refused to comply and faced the possible consequences of that choice." Id. at 1136.

## LAW REGARDING SUBSTANTIVE DUE PROCESS

"[T]he Due Process Clause was intended to prevent government officials from abusing their power, or employing it as an instrument of oppression." County of Sacramento v. Lewis,

523 U.S. 833, 840 (1998)(internal quotations omitted).  The Supreme Court of the United States has stated that "the substantive component of the Due Process Clause is violated by executive action only when it 'can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.'"  Id. at 846 (quoting Collins v. City of Harker Heights, 503 U.S. at 128). The Supreme Court has made it clear that the guarantee of due process is not a "font of tort law" to be used to impose liability any time a government actor causes harm.  County of Sacramento v. Lewis, 523 U.S.  at 848 (internal quotations omitted).  "[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level."  Id. (citing Daniels v. Williams, 474 U.S. 327, 331 (1986)).  To establish a substantive due process claim, the "plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." Camuglia v. City of Albuquerque, 448 F.3d 1214, 1223 (10th Cir. 2006)(quoting Uhlrig v. Harder, 64 F.3d 567, 574 (10th Cir. 1995)).

In Camuglia v. City of Albuquerque, a city restaurant inspector shut down a restaurant for one day and notified the media in accordance with the policies of the Albuquerque Environmental Health Department that the restaurant's permit had been suspended. See 448 F.3d at 1216-17.  Camuglia, the owner of the restaurant, alleged that the inspector violated his substantive due-process rights because he had no basis for suspending the permit and was "wrong about the health danger, [ ] even intentionally and maliciously wrong."  Id. at 1219. Camuglia did not contend that the inspector acted unreasonably when he first noted certain violations and notifying the media was a routine part the inspector's job.  "Even if [the inspector made a poor decision, Camuglia presents no evidence that [the inspector]'s actions were arbitrary, capricious, or without a rational basis. . . . Thus, Camuglia's allegations do no meet the

-15-

high standard that the Supreme Court set for substantive due process claims in <u>County of Sacramento v. Lewis.</u>" <u>Camuglia v. City of Albuquerque,</u> 448 F.3d at 1222 (citations omitted). Such routine and objectively reasonable actions are insufficient to shock the conscience. <u>See</u> <u>id.</u> at 1223. "[A] plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing power." <u>Id.</u> at 1222.

<u>**LAW REGARDING SUPPLEMENTAL JURISDICTION**</u>

Federal courts are courts of limited jurisdiction. Even where a statutory basis exists for the Court to exercise jurisdiction over the controversy, there may be an issue whether the court should exercise its limited discretion to decide state claims after it dismisses the federal claim. The exercise of supplemental jurisdiction is governed by concerns of judicial economy and fairness.

1.      <u>**Supplemental Jurisdiction.**</u>

It is a fundamental precept of American law that the federal courts are "courts of limited jurisdiction." <u>Exxon Mobil Corp. v. Allapattah Servs., Inc.,</u> 545 U.S. 546, 552 (2005). Federal courts "possess only that power authorized by [the] Constitution and statute." <u>Kokkonen v. Guardian Life Ins. Co. of Am.,</u> 511 U.S. 375, 377 (1994). Among the powers that Congress has bestowed upon the courts is the power to hear controversies arising under federal law -- federal-question jurisdiction -- and controversies arising between citizens of different states -- diversity jurisdiction. <u>See</u> 28 U.S.C. §§ 1331, 1332.

Although a statutory basis is necessary for federal courts to exercise jurisdiction over a controversy, "it is well established -- in certain classes of cases -- that, once a court has original jurisdiction over some claims in the action, it may exercise supplemental jurisdiction over additional claims that are part of the same case or controversy." <u>Exxon Mobil Corp. v.</u>

-16-

Allapattah Servs., Inc., 545 U.S. at 552.  The Supreme Court has long subscribed to the concept of supplemental jurisdiction recognized in two common-law doctrines -- pendent and ancillary jurisdiction.  Federal courts may exercise pendent jurisdiction over state-law claims when "state and federal claims . . . derive from a common nucleus of operative fact."  United Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966).  Ancillary jurisdiction gives federal courts the flexibility to hear a cause of action--even after the introduction of third parties whose insertion into the litigation is not supported by any independent grounds for federal jurisdiction--when those parties share a common interest in the outcome of the litigation and are logical participants in it. See Owen Equip. & Erection Co. v. Kroger, 437 U.S. 365, 375 n.18 (1978).

In 1988, Chief Justice William H. Rehnquist created the Federal Courts Study Committee to analyze the federal court system and to recommend reforms.  See 16 Moore's Federal Practice ¶ 106.04[5], at 106-27 (3d ed. 2008).  In response to the Committee's findings regarding "pendent" and "ancillary" jurisdiction, Congress codified the application of the two doctrines when it passed the Judicial Improvements Act of 1990:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367(a).  In enacting 28 U.S.C. § 1367, Congress conferred upon federal district courts "supplemental forms of jurisdiction . . . [that] enable them to take full advantage of the rules on claim and party joinder to deal economically -- in single rather than multiple litigation -- with matters arising from the same transaction or occurrence."  Report of the Federal Courts Study Committee, Part II.2.B.2.b. (April 2, 1990), reprinted in 22 CONN. L. REV. 733, 787 (1990).

-17-

2.      **District Court Discretion**.

The Tenth Circuit has followed the Supreme Court's lead in classifying supplemental jurisdiction not as a litigant's right, but as a matter of judicial discretion.  See Estate of Harshman v. Jackson Hole Mountain Resort Corp., 379 F.3d 1161, 1165 (10th Cir. 2004)(citing City of Chi. v. Int'l Coll. of Surgeons, 522 U.S. 156, 173 (1997)).  In circumstances where the supplemental-jurisdiction statute may support supplemental jurisdiction, the district court retains discretion to decline to exercise that jurisdiction.  The traditional analysis, based on the Supreme Court's opinion in United Mine Workers v. Gibbs, compelled courts to consider "judicial economy, convenience and fairness to litigants" when deciding whether to exercise supplemental jurisdiction.  383 U.S. at 726.  Similarly, Congress' supplemental jurisdiction statute enumerates four factors that the court should consider:

> (1) the claim raises a novel or complex issue of State law,
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
>
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).   In applying these factors, district courts should seek to exercise supplemental jurisdiction in an effort to "vindicate values of economy, convenience, fairness, and comity."  Estate of Harshman v. Jackson Hole Mountain Resort Corp., 379 F.3d at 1164.

Numerous courts have acknowledged that 28 U.S.C. § 1367(c) necessarily changed the district courts' supplemental-jurisdiction discretion analysis and that, unless one of the conditions of 28 U.S.C. § 1367(c) exists, courts are not free to decline jurisdiction.  See Itar-Tass Russian News Agency v. Russian Kurier, Inc., 140 F.3d 442, 447 (2d Cir. 1998)("Section 1367

has indeed altered <u>Gibbs</u>' discretionary analysis."); <u>McLaurin v. Prater</u>, 30 F.3d 982, 985 (8th Cir. 1994)("The statute plainly allows the district court to reject jurisdiction over supplemental claims only in the four instances described therein."); <u>Executive Software N. Am., Inc. v. U.S. Dist. Court</u>, 24 F.3d 1545, 1557 (9th Cir. 1994)("By codifying preexisting applications of <u>Gibbs</u> in subsections (c)(1)-(3), however, it is clear that Congress intended the exercise of discretion to be triggered by the court's identification of a factual predicate that corresponds to one of the section 1367(c) categories."); <u>Palmer v. Hosp. Auth.</u>, 22 F.3d 1559, 1569 (11th Cir. 1994)("[S]upplemental jurisdiction must be exercised in the absence of any of the four factors of section 1367(c)."). At least one other district court in the Tenth Circuit has reached the same conclusion. <u>See</u> <u>Gudenkauf v. Stauffer Comm'ns, Inc.</u>, 896 F. Supp. 1082, 1084 (D. Kan. 1995)("[A]ny exercise of discretion declining jurisdiction over pendent claims or parties cannot occur until 'triggered' by the existence of one of the four conditions enumerated.").

## ANALYSIS

For Count I of his Amended Complaint, Jenkins asserts that his rights to procedural and substantive due process, and his right to equal protection under the law, were violated. At the September 3, 2006 hearing, Jenkins conceded that the Supreme Court's decision in <u>Engquist v. Oregon Dept. of Agricultur</u>, precluded his class-of-one equal-protection claim. <u>See</u> Tr. at 38:5-14. Moreover, Jenkins has failed to establish the essential elements of his procedural and substantive due-process claims.

## I. THE RECORD DOES NOT SUPPORT A FINDING OF CONSTRUCTIVE DISCHARGE.

To establish a violation of procedural due process, Jenkins must show that he had a protected property interest in continued employment and that he suffered deprivation of that property interest without due process of law. Because Jenkins was a public employee whose

employment could be terminated only for cause, he had a constitutionally protected property interest in continued employment.  See Copelin-Brown v. N.M. State Pers. Office, 399 F.3d at 1245.  Jenkins submitted his resignation, thus he can show a violation of his procedural due-process right only if his resignation was not voluntary.  To show that his resignation was not voluntary, Jenkins must show that his work environment was so intolerable that "a reasonable person would have felt compelled to resign."  Lighton v. Univ. of Utah, 209 F.3d at 1222.  "The question is not whether working conditions became difficult or unpleasant."  Id.

Whether an employee has been constructively discharged is an objective inquiry into whether a reasonable person in the circumstances would feel he or she had no other option but resignation.  See id. at 1222.  To determine whether an employee's resignation was voluntary requires examining whether the employee "(1) received some alternative to resignation; (2) understood the nature of his choice; (3) had a reasonable time in which to choose; and (4) was permitted to select the effective date of resignation."  Id.

That an employee may not like the options available to him does not mean that the employee has no options.  In Yearous v. Niobrara County Mem'l Hosp., the plaintiff nurses complained that the supervisor "(1) compromised their ethics, (2) requested them to commit Medicare fraud, (3) jeopardized patient care, and (4) violated internal policies and procedures." 128 F.3d 1351 at 1356.  The Tenth Circuit held that, despite the potentially unethical and unlawful consequences of complying with their supervisor's orders, the nurses still had the options of complying or attempting to resolve the situation internally.   Similarly, Jenkins had the option of refusing to provide the requested documentation of his medical condition and assuming the consequences of that refusal, or complying, as he did.   Additionally, Jenkins could have chosen either to return to work after the expiration of his medical leave or requested

additional leave.  If he was unable to return to work and additional leave was denied, he would have received the procedural protections of his employment contract.

Just as there was no evidence that "Dr. Lighton did not understand his alternatives, even though he considered one of the alternatives, the possibility of disciplinary proceedings -- an unpleasant one," there is no evidence that Jenkins did not understand his alternatives.  Lighton v. Univ. of Utah, 209 F.3d at 1222.  Because Jenkins had an attorney and seventeen-years experience working for the District, one may assume -- in the absence of evidence to the contrary -- that he understood his options.  Dr. Lighton took three weeks after being asked to sign the settlement agreement before choosing to resign.  See id. at 1223. Jenkins had two months of medical leave to consider his options and decided to resign on September 13, 2006. Jenkins submitted his resignation on September 26, 2006.  Jenkins thus chose the effective date of his resignation.  Jenkins' resignation was voluntary and, despite unpleasant work conditions and his own severe mental and emotional reaction to those conditions, he was not constructively discharged.

"An employee who quits without giving his employer a reasonable chance to work out a problem has not been constructively discharged."  Yearous v. Niobrara County Mem'l Hosp., 128 F.3d at 1357.  If Diaz' conduct was the predominant source of Jenkins' work-related stress, he could have filed a complaint or sought some sort of internal resolution of the matter.  There is no evidence that Jenkins attempted any resolution before resigning or made any effort to make his concerns known.

In reviewing a motion for summary judgment, the court looks at the evidence in the light most favorable to the non-moving party. See Sigmon v. Community Care HMO, Inc., 234 F.3d at 1124-25. Even if the Board wanted Jenkins fired and encouraged Diaz' hostility, causing

Jenkins to suffer severe emotional and physical distress, the record does not support the conclusion that a reasonable person in these circumstances would have no other choice but to resign.

"It is not enough that a plaintiff suffered the ordinary slings and arrows that workers routinely encounter in a hard, cold world." Exum v. U.S. Olympic Comm., 389 F.3d at 1135. Diaz' conduct was not constitutionally intolerable. Jenkins complains that Diaz unnecessarily required that he apologize to Briseno. Yet Jenkins agrees that, had he been rude, it was in the Superintendent's authority to request that he apologize. Jenkins identifies only two other incidents involving Diaz: (i) her rude comment at an administrative staff meeting; and (ii) her accusation that he used her parking space. Assuming that these two encounters were exactly as Jenkins alleges, two incidents of rude and insensitive conduct do not constitute constitutionally intolerable work conditions, despite the intense effect Jenkins alleges that they had on him. Nor is the additional stress which Jenkins alleges that he experienced as a result of the rumors that the Board had targeted him for termination sufficient to raise Diaz' conduct to the level of the objectively intolerable. These rumors are more similar to "the ordinary slings and arrows that workers routinely encounter in a hard, cold world." Id. The Tenth Circuit has "previously explained that the fact that a plaintiff considers his or her workplace stressful and may have suffered personal health problems as a result is not an objective criterion used to determine if a reasonable employee would have been compelled to resign." Id. at 1136 n. 7.

Jenkins' allegation that the on-going legal correspondence made conditions intolerable during his medical leave does not save his procedural due-process claim. While it may have been unusual for a district employee to be required to provide documentation to justify leave, the FMLA authorizes employers to request such information. Because Jenkins had been observed at

a casino during his extended leave, it was not unreasonable for the Board to request verification of his medical condition to insure leave was not being abused.  Similarly, it was reasonable for the Board to inform Jenkins that the February 2006 complaint of sexual harassment had been re-submitted and that the investigation would be re-opened.  Jenkins admits that he was not concerned about the allegations of sexual harassment.  In <u>Yearous v. Niobrara County Mem'l Hosp.</u>, the Tenth Circuit held that, while there were "numerous instances of questionable judgment on behalf of all involved," it could not find that the poor choices of the administration or nurses were sufficient to support a claim of constructive discharge.  <u>Yearous v. Niobarra County Mem'l Hosp.</u>, 128 F.3d at 1357.  Rather than revealing a course of organized and relentless harassment of Jenkins by the Board and its agents, the record reveals that the Board sought to accommodate Jenkins' deteriorating condition while still discharging its responsibilities to insure leave was not being abused and its obligation to investigate the re-filed sexual harassment claim.

Jenkins has failed to show that his work environment and the subsequent legal correspondence were so intolerable that he had no other option but to quit.  The record reveals that Jenkins had alternatives besides tendering his resignation, that there is no evidence that he did not understand those options, that he had two months of medical leave in which to consider his alternatives, and that, because he had decided to quit on September 13, 2008, but submitted his resignation on September 26, 2008, he chose the effective date of his resignation.  There is no genuine issue of material fact that Jenkins' resignation was voluntary, and thus no procedural due-process violation occurred.

## II.     THE  EVIDENCE  DOES  NOT  SUPPORT  A  SUBSTANTIVE  DUE-PROCESS VIOLATION.

Jenkins alleges that Diaz' and the Board's arbitrary and egregious conduct violated his substantive due-process rights.  To support a substantive due-process violation, "[t]he plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking."  Camuglia v. City of Albuquerque, 448 F.3d at 1223.[4]

Jenkins has failed to show that the conduct of Diaz and of the Board, either individually or in combination, was sufficiently outrageous to shock the judicial conscience.  In Camuglia v. City of Albuquerque, the plaintiff's restaurant permit was suspended, and the suspension was reported to the media, implying that it "had somehow become an unhealthy facility in which to eat."  Camuglia v. City of Albuquerque, 448 F.3d at 1222.  The Tenth Circuit found, however that, while the inspector may have been "wrong about the health, perhaps even intentionally and maliciously wrong," the inspector's actions constituted "a routine part of [his] job."  Id. at 1223. Similarly, Diaz and the Board acted within their authority to question Jenkins' professionalism, to require documentation of his medical condition, and to investigate claims of sexual harassment against him.  Diaz and the Board acted reasonably, and additionally made efforts to accommodate Jenkins' ill health, such as granting leave and granting an extension of time to file

---

[4] In Seegmiller v. Laverkin City, the Tenth Circuit clarified that substantive due-process claims can be evaluated either as to whether the alleged conduct shocks the judicial conscience or whether the plaintiff has been deprived of a fundamental-liberty interest. A fundamental-liberty interest includes "the right to marry, to have children, to direct the education  and raising of one's own children, to marital privacy, to use contraception and obtain abortion and to bodily integrity." 528 F.3d 762, 770-771 (10th Cir. 2008). Because Jenkins alleges that he was deprived of a protected property interest in continued employment and does not allege that he was deprived of a fundamental liberty interest, it is not necessary to engage in a fundamental-liberty analysis. See id. at 769.

the requested documentation.  "[T]he Due Process Clause is not a guarantee against incorrect or ill-advised government decisions."  Camuglia v. City of Albuquerque, 448 F.3d at 1222.  That Diaz and the Board may have been incorrect in their respective allegations of Jenkins' inappropriate conduct, sexual harassment, and abuse of leave does not mean that they violated Jenkins' constitutional rights.  Jenkins' allegations fail to meet the high level of outrageousness necessary to support a substantive due-process violation.

## III.    THE COURT WILL EXERCISE SUPPLEMENTAL JURISDICTION.

Because there are no federal claims other than the due-process and equal-protection claims, the Court may decline supplemental jurisdiction over the state claims.  See 28 U.S.C. § 1367(c)(3). The Court believes, however, that the best course of action would be to exercise supplemental jurisdiction over the remaining claims.   Indeed, the Court has already orally granted motions to dismiss the state-law claims in this case.

Count V of the Amended Complaint also turns on whether there has been a constructive discharge.  Because the Court finds that there was no constructive discharge, both federal and state judicial economy favor the Court deciding Count V as well.  The remaining counts, Counts II, III, and IV, do not involve complicated or novel issues of state law, but are relatively easily decided.  Again, judicial economy indicates that the Court should retain jurisdiction and decide those counts as well.

**IT IS ORDERED** that Defendant's Motion for Partial Summary Judgment is granted.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Lawrence M. Pickett
The Pickett Law Firm, LLC
Las Cruces, New Mexico

     *Attorney for the Plaintiff*

Elizabeth L. German
Brown and German
Albuquerque, New Mexico

     *Attorney for Defendant Board of the Las Cruces*
      *Public School District*

H. Nicole Werkmeister
Narvaez Law Firm, P.A.
Albuquerque, New Mexico

     *Attorney for Defendant Sonia Diaz*